J-S04014-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: A.R.B., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| APPEAL OF: D.B., THE FATHER OF A.R.B., | |
| Appellant | No. 1025 WDA 2015 |

Appeal from the Order Entered June 12, 2015
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s): AP 177 2014
tpr-14-177

BEFORE:  BOWES, OLSON, and STRASSBURGER,* JJ.

MEMORANDUM BY BOWES, J.:                    **FILED MARCH 8, 2016**

D.B. ("Father") appeals from the order entered on June 12, 2015, wherein the orphans' court granted the petition filed by the Allegheny County Office of Children, Youth and Family ("CYF") seeking to terminate Father's parental rights to his daughter, A.R.B., pursuant to 23 Pa.C.S. § 2511(a) and (b).  We affirm.[1]

The orphans' court summarized the relevant facts and procedural history as follows:

---

[1] The orphans' court also terminated the parental rights of the birth mother, L.S., who did not appeal.

---

\* Retired Senior Judge assigned to the Superior Court.

A.R.B. came to the attention of the agency when she was born positive for opiates and THC [during] May [of] 2013. ***See*** Testimony of Transcript ("T.T."), dated June 12, 2015, at 63. The original case was only open a month before CYF closed out, as the parents apparently became enrolled in a drug and alcohol treatment. ***Id***., at 64. However, CYF reopened the case in August after there were concerns that the parents were drinking and "nodding off" while parenting the infant. ***Id***. The parents had been staying with the Paternal Grandmother, who is the child's pre-adoptive foster mother. ***Id***., at 65. And so the child was technically removed from the parents' care, but returned to the same physical home. ***Id***. Indeed, the child has only resided in this home throughout her short life. Both parents stipulated to the child's dependency status at the adjudicatory hearing on August 26, 2013. ***Id***. She has never returned to either parent's care. ***Id***. For a time during the course of the case, Father was incarcerated at the Allegheny County Jail, at the Renewal Center and then back at the Allegheny County Jail after he relapsed. He had been convicted in September 2013 for the manufacture or delivery or possession with intent to manufacture or deliver a controlled substance, for possession of marijuana and for drug paraphernalia, among other things. ***Id***., at 82-83. He was ultimately released after approximately 14 months in October 2014[.] [T]he Petition to Terminate Parental Rights was filed on October 17, 2014.

Following the dependency determination, CYF created a Family Service Plan ("FSP"), which is designed to help the parents achieve reunification with their child. . . . Father's initial goals were: meet and maintain the demands of daily living (that is, find employment and obtain housing); achieve and maintain recovery from substance abuse; maintain contact and cooperation with CYF; visit the child; and parenting. ***Id***., at 76.

Trial Court Opinion, 8/4/15, at 4-5.

During the evidentiary hearing, CYF presented the testimony of Patricia Pepe Ph.D., the court appointed evaluator and expert in child psychology, Michelle Schultz, the CYF caseworker assigned to the family between February 3, 2014 and October 24, 2014, and Melissa Fuchs,

A.R.B.'s home study caseworker. CYF also called one of the pre-adoptive foster parents ("Paternal Grandmother") and her ex-husband ("Paternal Grandfather"), with whom Father resided for a portion of the time relevant herein. Father testified on his own behalf.

The CYF witnesses outlined Father's FSP goals and testified that his compliance was moderate. He maintained contact with A.R.B. and participated in some parenting classes and drug treatment programs while he was incarcerated or in alternative confinement at the Renewal Center. Likewise, he obtained employment and eventually moved from Paternal Grandfather's home, albeit to a residence shared by three roommates who had not been vetted by CYF.

Significantly, however, Father failed to adequately address his problems with drug and alcohol abuse, which is the precise reason for A.R.B.'s placement. Father failed to enroll in any treatment programs since his April 2014 relapse. N.T., 6/12/15, at 78-79, 133. He missed nine drug screens, four of which were without excuse or explanation. *Id*. at 129-134, 174. One of the missed screens was requested by Paternal Grandfather after Father neglected to return home following a night out with friends. *Id*. at 195-196. Additionally, Father did not obtain a sponsor through Alcoholics Anonymous ("AA") or attend meetings four times per week as recommended by Dr. Pepe. *Id*. at 143. Father attended only one meeting per week, which he failed to document with CYF, and he declined to engage a sponsor. *Id*. at

132-33, 222. Furthermore, while Father testified that he had been sober since his April 2014 relapse, in reality Father continued to imbibe until approximately one month before the June 2015 hearing. *Id*. at 230-231. Indeed, Father testified that he lied during the AA meetings about the extent of his sobriety. *Id*. 233-234.

Notwithstanding Father's failure to address his substance abuse, Dr. Pepe recommended that the agency pursue subsidized permanent legal custody ("SPLC") in lieu of the termination of Father's parental rights and the adoption of A.R.B. by Paternal Grandmother and her husband (collectively, "Foster Parents"). That recommendation was based upon two concerns. First, Dr. Pepe was swayed by Father's report that Paternal Grandmother was bedridden due to a diagnosis of Multiple Sclerosis ("MS"). Second, Dr. Pepe detected a bond between A.R.B. and Father, and she was apprehensive that Foster Parents would interfere with Father's post-adoption contact with his daughter.

At the close of the evidentiary hearing, the orphans' court concluded that CYF satisfied its burden of proving the statutory grounds for involuntary termination of parental rights outlined in § 2511(a) (2), (5), (8) and (b). This timely appeal followed. Father complied with Pa.R.A.P. 1925(a)(2)(i) by filing a statement of errors complained of on appeal concurrent with his notice of appeal.

Father raises two issues for our review:

I.  Whether the Trial Court erred and/or abused its discretion in finding that the Office of Children, Youth and Families met their burden of proof and proved by clear and convincing evidence that the parental rights of D.B. should be terminated pursuant to 23 Pa[.]C.S.A. 2511(a) (2), (5), and (8).

II.  Whether the Trial Court erred and /or abused its discretion in finding that the Office of Children, Youth and Families met their burden of proof and proved by clear and convincing evidence that terminating the parental rights of D.B. best meets the needs and welfare of A.R.B. pursuant to 23 Pa[.]C.S.A. § 2511(b).

Father's brief at 1.

Our standard of review is well settled.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  The trial court's decision, however, should not be reversed merely because the record would support a different result.  We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

**In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Involuntary termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.  As the party petitioning for termination of parental rights, CYF "must prove the statutory criteria for that termination by at least clear and convincing evidence."  **In re T.R.,** 465 A.2d 642, 644 (Pa. 1983).  Clear and convincing evidence is defined as

"testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 555 A.2d 1202, 1203–04 (Pa. 1989).

As noted, the orphans' court terminated Father's parental rights pursuant to § 2511(a)(2), (5), (8) and (b). We need only agree with the orphans' court's decision as to one subsection of 23 Pa.C.S. § 2511(a) and (b) in order to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Herein, we agree with the orphans' court's decision to terminate Father's parental rights pursuant to subsection 2511(a)(8), which provides as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>     . . . .
>
> (8) The child had been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
>     . . . .
>
> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing,

- 6 -

furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8) and (b).

In order to satisfy the requirements of § 2511(a)(8) in the case at bar, CYF was required to produce clear and convincing evidence that: (1) A.R.B. has been removed from Father for at least twelve months; (2) the conditions which led to the child's removal continue to exist; and (3) involuntary termination of parental rights would best serve A.R.B.'s needs and welfare.[2] *See In Re Adoption of M.E.P.*, 825 A.2d 1266, 1275-1276 (Pa.Super. 2003). "Notably, termination under Section 2511(a)(8), does **not** require an evaluation of [Father's] willingness or ability to remedy the conditions that led to placement of [his] children." *In re Adoption of R.J.S.*, 901 A.2d

_____

[2] Pursuant to § 2511(a)(8) and (b), we must twice examine A.R.B.'s needs and welfare. In *In Re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa.Super. 2008) (*en banc*), we explained "while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the 'needs and welfare of the child,' we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the 'needs and welfare' . . . as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b)." Instantly, Father does not challenge the needs and welfare component of § 2511(a)(8) relating to his parental deficiencies. Accordingly, we address his argument regarding the orphans' court's disregard of the beneficial relationship he shares with his daughter in the context of § 2511(b). *See C.L.G.*, *supra*, ("the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent.").

502, 511 (Pa.Super. 2006) (emphasis in original).

First, we observe that A.R.B. has been in CYF's care since August of 2013, due to concerns about Father's drug and alcohol abuse. As CYF did not file its petition to terminate Father's parental rights until October 17, 2014, approximately fourteen months later, the agency satisfied the threshold requirement of § 2511(a)(8). Next, as discussed *infra*, the certified record reveals that the drug and alcohol abuse that led to A.R.B.'s removal continued to exist as recently as one month prior to the evidentiary hearing.

Father invokes the fact that he completed most of the goals that CYF established in the FSP as a basis to preserve his parental rights. He highlights that he cooperated with CYF, maintained consistent and meaningful contact with his daughter that included periods of unsupervised visitation, obtained employment, completed programs while incarcerated and housed at the Renewal Center, and secured housing. He argues that he made strides toward reunification and utilized the services available to him. Hence, Father posits that CYF failed to prove by clear and convincing evidence that the conditions which led to A.R.B.'s placement continue to exist or that Father cannot remedy the issue within a reasonable time.

In addressing this argument, the orphans' court reasoned that Father's inability to remain sober under the circumstances of this case led it to conclude that Father could not parent A.R.B. beyond limited interactions

during visitation. The court stressed, "By his own account, Father has been clean from alcohol for only about the month immediately preceding the TPR hearing. Yet, he testified that he attends Alcoholics Anonymous meetings." Trial Court Opinion, 8/5/15, at 4. It continued that, despite Father's proffered preference of AA over Narcotics Anonymous ("NA"), he "is not serious about addressing his drug and alcohol issues. For example, he has yet to obtain a sponsor in either organization, [and] does not go to the recommended [number] of meetings." *Id*. Additionally, the orphans' court observed that Father missed several drug screens, almost one-half of those without explanation, and "even missed a screen as late as the week before the TPR hearing." *Id*. at 6.

Finally, the orphans' court referenced Father's failure to obtain mental health treatment as recommended by Dr. Pepe. It reasoned that Father's inaction implicated his underlying substance abuse problems and further evinced the continued existence of the conditions which led to A.R.B.'s removal from his care. The court concluded,

> [T]his is what persuades th[e] Court that the conditions that led to the child's removal still continue to exist, and thus that termination is warranted. It is true that Father has been improving since the removal of his child, but he has not demonstrated a real intent to address his drug and alcohol issues. He has not addressed his mental health issues. Dr. Pepe diagnosed Father with a mood disorder and a poly-substance dependency. *Id*., at 23. She recommended weekly mental health treatment to address depression and anxiety. *Id*. The concern is that Father will self-medicate or that he will become intoxicated, exercise poor judgment and relapse. *Id*. 25 -26. To

be clear, Father's poly-substance dependency means a dependency to multiple drugs. Although he was incarcerated for marijuana and although alcohol use was allegedly the drug that led to the child's removal, Father's drug use history also includes oxycodone and benzodiazepine. *Id*., at 76 -77. Father has failed to remedy these conditions.

Trial Court Opinion, 8/5/15, at 6.

For the following reasons, we affirm the trial court's decision. First, we observe that Father's assertion that the record does not demonstrate that he could not remedy his substance abuse within a reasonable amount of time is misplaced because that is not an element of § 2511(a)(8). *See In re Adoption of R.J.S.*, *supra* at 511. Indeed, the language that Father references relates only to the statutory grounds for termination under § 2511(a)(5).[3] Thus, that argument fails.

Moreover, the certified record confirms the orphans' court's determination. During the evidentiary hearing, Ms. Schultz, the former CYS caseworker assigned to the family testified about Father's ongoing ordeal with substance abuse. Father admitted to smoking marijuana when the child was removed from his and Mother's care and tested positive for

_____

[3] Section 2511(a)(5) is similar to (a)(8) except that the former requires only six months of placement and includes the additional elements that "the parent cannot or will not remedy those conditions within a reasonable period of time [and] the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time[.]" *See* 23 Pa.C.S. § 2511(a)(5).

benzodiazepine and oxycodone, which were his drugs of choice. N.T. 6/12/15, at 76-77. Indeed, Father stipulated during the dependency proceedings that his parenting deficiencies stemmed from his use of drugs and alcohol. *Id*. at 76.

Ms. Schultz further explained that, approximately three months after A.R.B.'s birth, Father was incarcerated for a collection of drug offenses, including possession of marijuana, possession of a controlled substance with intent to deliver, and possession of paraphernalia. *Id*. at 82-83; CYF Exhibit 2. The trial court imposed eleven and one-half to twenty-three months imprisonment followed by four years of probation. N.T., 6/12/15, at 84, CYF Exhibit 2. Father was released to the Renewal Center, a non-secure residential facility, approximately two weeks after the sentence was imposed. N.T., 6/12/15, at 78. However, following the April 2014 relapse, Father was re-incarcerated at the Allegheny County Jail until October 2014. *Id*. at 79, 86. Ms. Schultz reported that, between CYF's initial involvement and Father's re-incarceration, he completed a detoxification program administered by Western Psychiatric Institute and Clinic and a drug and alcohol treatment program administered by Cove Forge. *Id*. at 81. She stressed, however, that the agency did not have any documentation of Father participating in drug and alcohol treatment since his April 2014 relapse and re-incarceration. *Id*. at 86.

A.R.B.'s home study caseworker, Ms. Fuchs, testified consistently with Ms. Schultz regarding Father's lack of progress toward confronting his problems with drug and alcohol abuse. She discussed Father's drug screens and participation in AA and NA. As it relates to the urine screens, Ms. Fuchs stated that Father attended twenty of twenty-nine screens. *Id*. at 129. The results of those tests were negative. *Id*. Of the nine tests that Father missed, five were excused due to scheduling and coordination issues. *Id*. at 131. The remaining four were without any excuse or justification. *Id*. at 132. Father was aware that the agency treated the unexcused absences as positive tests, but he failed to proffer any explanations for the missed screens. *Id*. at 174.

In summarizing Father's lack of compliance with Dr. Pepe's recommendation to attend four AA or NA meetings per week and to utilize a sponsor, Ms. Fuchs testified that Father claimed that he attended one AA meeting per week but neglected to provide the agency with any documentation of his participation. *Id*. at 132-133. She relayed that Father did not attend the NA meetings because the AA meetings were more convenient and he felt comfortable with that community. *Id*. at 133. Ms. Fuchs articulated CYF's concern about Father's substance abuse. She noted that "Drug and alcohol use was one of the reasons that brought [A.R.B.] into care" and the agency was worried that Father would make poor decisions when he was under the influence of intoxicants. *Id*. at 135.

Next, we highlight that Dr. Pepe believed that Father's relatively recent use of alcohol was significant in this case given his history of abuse. Testifying within a reasonable degree of psychological certainty, Dr. Pepe indicated that imbibing is a risk factor for relapse in individuals with a history of substance abuse, and she expressed her concern that Father could start self-medicating to suppress his mental health issues. *Id*. at 27, 35, 42-43.

Notwithstanding Father's protestations to the contrary, the foregoing evidence sustains the orphans' court's determination that CYF proved by clear and convincing evidence the statutory grounds to terminate Father's parental rights to A.R.B. pursuant to § 2511(a)(8). The child was removed from Father's care for more than twelve months, the conditions that led to her removal continue to exist, and termination would best suit A.R.B.'s needs and welfare in relation to Father's weaknesses. Stated plainly, Father is not committed to his efforts to confront his substance abuse or his mental health problems. While Father completed detox and a treatment program during early 2014 and alleges that he currently attends one AA meeting per week, he has not engaged in any treatment since his April 2014 relapse. He consumed alcohol as recently as one month prior to the evidentiary hearing and misrepresented his sobriety. Moreover, he rejected Dr. Pepe's recommendations that he attend four AA meetings per week, utilize NA as a complement to the AA sessions, and secure a sponsor to assist with his rehabilitation. Additionally, we agree with the trial court's perspective that

Father's indifference to the four unexcused urine screens reveals a troubling lack of dedication to the rehabilitation process. Accordingly, we find that the record supports the orphans' court's conclusion that CYF satisfied the statutory requirements to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8).

Next, we address whether the orphans' court abused its discretion in finding that CYF presented sufficient evidence to demonstrate by clear and convincing evidence that terminating Father's parental rights and permanently severing the existing bond between him and A.R.B. would best serve the child's needs and welfare pursuant to § 2511(b). While the Adoption Act does not mandate that the trial court consider the effect of permanently severing parental bonds, our case law requires it where a bond exists to some extent. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993).

The extent of the orphans' court's bond-effect analysis depends upon the circumstances of a particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa.Super. 2008). We have emphasized that, while a parent's emotional bond with his child is a major aspect of the § 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the trial court when determining what is in the best interest of the child. *In re K.K.R.-S.*, 958 A.2d 529, 535-536 (Pa.Super. 2008). Indeed, the mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa.Super. 2008) (trial court's decision to terminate

parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child).

Herein, Dr. Pepe recommended neither reunification nor the termination of parental rights. Instead, for the reasons discussed below, Dr. Pepe recommended SPLC or an open adoption that permits continued contact between Father and A.R.B. N.T., 6/12/15, at 31-35, 53. Father argues that the orphans' court erred in declining to follow Dr. Pepe's recommendation to forego terminating Father's parental rights in order to pursue SPLC. The crux of this contention is that a positive attachment exists between A.R.B. and Father, and while that connection pales in comparison to the bond A.R.B. shares with Foster Parents, it would be detrimental to A.R.B. if the relationship with Father was severed.

As Father's position is based primarily upon Dr. Pepe's expert perspective, we review her testimony at the outset. Dr. Pepe testified that, A.R.B.'s attachment and bonding are very significant for her because young children require stability and dependability from caregivers to avoid developing attachment disorders later in their childhood. *Id*. at 11-12. She also noted that a lack of stability could cause developmental issues. *Id*. at 12. She defined "bonding" as a collection of behaviors and "attachment" as a psychological concept. *Id*. at 11.

Dr. Pepe completed a series of interactional evaluations between A.R.B. and Father. She characterized A.R.B.'s level of bond and attachment

to Father as a positive attachment, but not at the same level as with Foster Parents. *Id*. at 17-18. When asked whether she would describe the relationship as necessary and beneficial she explained, "Actually, yes, I would, . . . She's happy to see him. She responds well. He seems to know her very well in terms of what her needs are. And I do think it's an important relationship for her." *Id*. at 18. Hence, while A.R.B. neither depends upon Father in the same manner as Foster Parents nor views him as her psychological parent, the child does, in fact, exhibit some bonding with him. As it relates to terminating Father's parental rights, Dr. Pepe concluded that A.R.B. would suffer harm if future contact with Father was precluded. *Id*. at 35. However, she was not able to determine how detrimental the harm would be. *Id*. She was concerned that, "at some point[,] [A.R.B.] would recognize his absence [and] that would cause difficulty in her future." *Id*. at 37.

In addition to evaluating the bond between Father and A.R.B., Dr. Pepe also performed interactional evaluations between A.R.B. and Foster Parents. *Id*. at 8-9. She observed that A.R.B. had a positive primary attachment with her Foster Parents, with whom she has lived with since birth. *Id*. at 9-10. Dr. Pepe testified that Foster Parents are A.R.B.'s psychological parents in that she consistently identifies them as her primary caretakers. *Id*. at 11. She believed that removing the child from their care would cause psychological trauma, but conceded that the degree of trauma

would depend on the circumstances of the separation. *Id*. at 13. Importantly, Foster Parents confirmed with Dr. Pepe that they are willing to maintain post-adoption contact between A.R.B. and Father. *Id*. at. 14.

Ultimately, Dr. Pepe recommended SPLC or, to a lesser extent, open adoption because she detected a positive connection between A.R.B. and Father. *Id*. at 30-31. Due to Father's lack of progress in maintaining sobriety, she could not recommend reunification. *Id*. at 32. Dr. Pepe acknowledged A.R.B.'s primary attachment with Foster Parents and noted their clear intent to adopt the child; however, Dr. Pepe was persuaded by Father's insinuation that Paternal Grandmother was often bedridden by MS. *Id*. at 31. She stated, "I'm concerned about the future. So I'm recommending SPLC." *Id*. As it relates to the open adoption, she subsequently elucidated, "I discussed open adoption [with Foster Parents]. . . . I think open adoption is an option[,] [b]ut . . . my thinking was leaning more to SPLC." *Id*. at 34.

The orphans' court was not persuaded by Dr. Pepe's apprehension. The court observed that, while Dr. Pepe relied upon Father's characterization of Paternal Grandmother's physical condition, the evidence adduced during the hearing established that Paternal Grandmother was diagnosed with MS during 1996 and that the condition is in remission. *Id*. at 186. Paternal Grandmother testified that, when an intermittent relapse occurs, she experiences weakness on one side of her body and vision problems. *Id*.

She explained, "I am not bedridden from it. I will have to take . . . maybe a day or two . . . to get my eyes refocused. I will go on steroids and I usually bounce back." *Id*. She highlighted that she continued to raise Father and his three siblings since the diagnosis and that she and her husband have an extensive support network, including a backup caregiver with appropriate certifications, if an emergency should arise. *Id*. at 187. Upon review of these additional facts, which Dr. Pepe apparently did not consider, we have no basis to disturb the orphans' court's conclusion that Paternal Grandmother's diagnosis of MS should not preclude Foster Parents from adopting A.R.B.

The certified record also supports the orphans' court's decision to discount Dr. Pepe's anxiety that Foster Parents would prevent post-adoption contact between A.R.B. and Father. Contrary to Dr. Pepe's perspective, Paternal Grandmother testified that she and her husband would continue to provide Father access to his daughter following the adoption. She stated, "I have no problem with [Father] seeing her. . . I have no problem with him. He's my son. I love him. [H]e's made some bad moves, but . . . he's still her father and I would not have her if it was not for him." *Id*. at 189-190. This is clear and convincing evidence that Foster Parents support Father's post-adoption contact with A.R.B. In contrast, nothing in the record sustains Father's speculation that, one day, Foster Parents will decline to sanction

that relationship.   As the record supports the trial court's finding that Dr. Pepe's concerns were misplaced, Father's assertions of error fail.

For all of the foregoing reasons, we affirm the orphans' court order terminating Father's parental rights to A.R.B. pursuant to § 2511(a)(8) and (b).

Order affirmed.

Judge Strassburger joins this memorandum.

Judge Olson concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/8/2016